# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **MARCIA G. FLEMING, individually, as representative of a class of participants and beneficiaries of the Rollins, Inc. 401(k) Savings Plan and Western Industries Retirement Savings Plan,** | **CASE NO: _____** |
| **Plaintiffs,** | **CLASS ACTION COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **ROLLINS, INC., AS ADMINISTRATOR OF THE ROLLINS, INC. 401(K) SAVINGS PLAN; WESTERN INDUSTRIES-NORTH, AS ADMINISTRATOR OF THE WESTERN INDUSTRIES RETIREMENT SAVINGS PLAN; THE ADMINISTRATIVE COMMITTEE OF THE ROLLINS, INC. 401(K) SAVINGS PLAN; THE ADMINISTRATIVE COMMITTEE OF THE WESTERN INDUSTRIES RETIREMENT SAVINGS PLAN; THE INVESTMENT COMMITTEE OF THE ROLLINS, INC. 401(K) SAVINGS PLAN; THE INVESTMENT COMMITTEE OF THE WESTERN INDUSTRIES RETIREMENT SAVINGS PLAN; and JOHN DOES 1-30,** |  |
| **Defendants.** |  |

## <u>CLASS ACTION COMPLAINT</u>

1.

Plaintiff Marcia G. Fleming ("Fleming"), individually and as representative of the class of participants and beneficiaries of the Rollins 401(K) Savings Plan (the "Rollins Plan") and the Western Industries Retirement Savings Plan (the "Western Plan") (collectively, the "Plans"), brings this action against Defendants Rollins, Inc. ("Rollins"), in its capacity as the administrator of the Rollins Plan; Western Industries-North, LLC, in its capacity as the administrator of the Western Plan ("Western"); the Administrative Committee of the Rollins Plan (the "Rollins Administrative Committee"); the Administrative Committee of the Western Plan (the "Western Administrative Committee"); the Investment Committee of the Plan (the "Rollins Investment Committee"); the Investment Committee of the Plan (the "Western Investment Committee"); and John Does 1-30 (collectively, "Defendants") for equitable relief  under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et. al* ("ERISA").

## I.    INTRODUCTION

2.

ERISA's fiduciary duties are the "highest known to the law" and require fiduciaries to act with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

2

3.

As fiduciaries to the Plans, Defendants are obligated to limit Plan expenses to a reasonable amount and to prudently investigate and select investment options for the exclusive benefit of participants, rather than allowing a conflicted third party to dictate Plan decisions that will benefit the third party. Defined contribution plans with hundreds of millions of dollars in assets, like the Plans, have tremendous bargaining power in the marketplace for retirement plan services, and can demand high-quality administrative and investment management services at low cost. Instead of leveraging the Plans' bargaining power to benefit participants, Defendants allowed conflicted third parties to dictate Plan decisions, hiring imprudent vendors to assist with the Plan's investments, allowing them to put improper investment funds in the Plans, and allowing them and other vendors to collect unreasonable and excessive fees, all at the expense of participants' retirement savings.

4.

To remedy these fiduciary breaches, Plaintiff, individually and as a representative of a class of participants and beneficiaries of the Plans, brings this action for herself under 29 U.S.C. §1132(a)(3) and on behalf of the Plans under 29 U.S.C. §1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plans all losses resulting from each breach of

fiduciary duty and to restore to the Plans any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## II.    JURISDICTION AND VENUE

### 5.

This Court has original and exclusive jurisdiction over the subject matter of this ERISA action under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1).

### 6.

Venue is proper in this District under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where at least one Defendant (Rollins) resides.

## III.    PARTIES

### A.    The Plans

### 7.

The Plans are defined contribution, individual account, employee benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34).

8.

The Plans are established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1).

9.

The Plans provide for retirement income for eligible employees of Rollins and Western, including Fleming and the class of participants which she represents.

10.

A participant's retirement income depends upon contributions from each employee, employer matching contributions, and from the performance of the Plans' investment options, net of fees and expenses.

11.

As of December 31, 2018, the Plans had over $730 million in net assets and over 13,300 participants with account balances.  Given their size, the Plans have enormous bargaining power by reason of their massive size to command very low investment management and recordkeeping fees for its participants.

**B.    Plaintiffs**

12.

At all material times, Fleming, as an eligible employee of Rollins, was a participant in the Rollins Plan under 29 U.S.C. §1002(7) as she and her beneficiaries are or may become eligible to receive benefits under the Plan.

13.

The putative Class members, as eligible employees of either Rollins or

Western, were participants in, respectively the Rollins Plan or the Western Plan.

14.

Because of the commonality of fiduciaries, service providers and

investments, Fleming may also represent the participants of the Western Plan as

noted by <u>Fallick v. Nationwide Mut. Ins. Co.</u>, 162 F.3d 410 (6th Cir. 1998) ("[T]he

standing  related  provisions  of  ERISA were not intended to limit a claimant's

right to proceed under Rule 23 on  behalf of all individuals affected by

the...challenged conduct, regardless of the representative's lack of participation in

all the ERISA-governed plans involved.")

15.

An action under 29 U.S.C. §1132(a)(2) allows recovery only for a plan, and

does not provide a remedy for individual injuries distinct from plan injuries. *LaRue*

*v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The Plan is the victim of

any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section

1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue

derivatively as a representative of a plan to seek relief on behalf of the plan. 29

U.S.C. §1132(a)(2). As explained in detail below, the Plans suffered millions of

dollars in losses resulting from Defendants' fiduciary breaches and remains

exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff.

16.

Plaintiff also has standing under 29 U.S.C. § 1132(a)(3), which provides redress for individual injuries insofar as the Plaintiff has suffered such an injury in the following ways:

a.    The named Plaintiff and all participants in the Plans suffered financial harm as a result of the imprudent, arbitrary and excessive fee structures in the Plans because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent and excessive cost options and payment of excessive recordkeeping fees.

b.    The individual accounts of the named Plaintiff and all participants in the Plans were harmed because they invested in the Plans' investment options that would have been excluded from the Plans had Defendants discharged their fiduciary duties. These investment options charged excessive fees or underperformed numerous prudent alternatives that were available to the Plans, resulting in a loss of retirement savings.

c.    The individual accounts of the named Plaintiff and all participants in the Plans suffered losses because each participant's account was assessed an excessive amount for recordkeeping. administrative and investment management fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plans and reduced those fees to a reasonable level.

## C.    Defendants

17.

Rollins, a Georgia corporation headquartered in Atlanta, is one of the largest pest control companies in the United States. Rollins is the named fiduciary of the Plan, responsible for the control, management, and administration of the Rollins Plan.  Rollins is the plan sponsor and plan administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, has exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Rollins Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Rollins Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income. Rollins also is fiduciary to the Rollins Plan because it exercised discretionary authority or discretionary control respecting the management of the Rollins Plan or

exercised authority or control respecting the management or disposition of its

assets, and has discretionary authority or discretionary responsibility in the

administration of the Rollins Plan. 29 U.S.C. §1002(21)(A).

18.

Western, a New Jersey corporation headquartered in Parsippany, New

Jersey, is a wholly-owned subsidiary of Rollins, Inc. Rollins, Inc. as primary

business owner of all its for-profit going concerns, has ultimate responsibility

for current funding and accrued liabilities of enterprises under its control such

as Western Industries, et al. Western Industries-North is the named fiduciary of

the Western Plan, responsible for the control, management, and administration of

the Western Plan.  Western is the Plan sponsor and Plan Administrator under 29

U.S.C. §1002(16)(A)(i), and upon information and belief, has exclusive

responsibility and complete discretionary authority to control the operation,

management and administration of the Western Plan, with all powers necessary to

enable it properly to carry out such responsibilities, including the selection and

compensation of the providers of administrative services to the Western Plan and

the selection, monitoring, and removal of the investment options made available to

participants for the investment of their contributions and provision of their

retirement income. Western also is fiduciary to the Western Plan because it

exercised discretionary authority or discretionary control respecting the

management of the Western Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A).

19.

The Rollins Administrative Committee, upon information and belief, is responsible for the administration of the Rollins Plan, including determining the eligibility for participation and for benefits, directing the Rollins Plan's trustee to pay benefits, and interpreting provisions of the Rollins Plan, determining what constitutes a reasonable expense of administering the Rollins Plan, determining whether such expenses shall be paid from the Rollins Plan's Trust, charging against Rollins Plan accounts such reasonable administrative fees as may be established from time to time, and interpreting the Rollins Plan. The Administrative Committee is a fiduciary to the Rollins Plan to the extent it was delegated the function of Plan Administrator and both had and exercised discretionary authority, control, and/or responsibility respecting the management and/or administration of the Rollins Plan and control over Rollins Plan assets. 29 U.S.C. §1002(21)(A).

20.

The Rollins Investment Committee is responsible for the selection,

monitoring, and retention of Rollins Plan investment options, has express

discretionary authority and control respecting management of the Rollins Plan and

Rollins Plan assets, and, hence, is a fiduciary under 29 U.S.C. §1002(21)(A).

21.

The Western Administrative Committee, upon information and belief, is

responsible for the administration of the Western Plan, including determining the

eligibility for participation and for benefits, directing the Western Plan's trustee to

pay benefits, and interpreting provisions of the Western Plan, determining what

constitutes a reasonable expense of administering the Western Plan, determining

whether such expenses shall be paid from the Western Plan's Trust, charging

against Western Plan accounts such reasonable administrative fees as may be

established from time to time, and interpreting the Western Plan.  The Western

Administrative Committee is a fiduciary to the Western Plan to the extent it was

delegated the function of Plan Administrator and both had and exercised

discretionary authority, control, and/or responsibility respecting the management

and/or administration of the Western Plan and control over Western Plan assets. 29

U.S.C. §1002(21)(A).

22.

The Western Investment Committee is responsible for the selection,

monitoring, and retention of Western Plan investment options, has express

discretionary authority and control respecting management of the Western Plan and Western Plan assets, and, hence, is a fiduciary under 29 U.S.C. §1002(21)(A).

23.

John Does 1-30, as members of the Plans' Administrative Committees or the Investment Committees during the class period, are fiduciaries to the Plans because they exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and have or had discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A).

24.

Because the individuals and entities described above acted as alleged herein as agents of Rollins and/or Western, all defendants are collectively referred to hereafter as "Defendants."

25.

The Defendants are commonly referred to by the U.S. Department of Labor (DOL) as "responsible plan fiduciaries (RPF)" as well as "trustees" (since defined contribution plans must have a trust and trust agreement to comply with ERISA and IRS tax qualification purposes). Courts have repeatedly made clear that ERISA's fiduciary duties are "derived from the common law of trusts." Tibble v.

Edison Int'l, 135 S. Ct. 1823, 1828 (2015) (quoting Central States, Se. & Sw.

Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 570 (1985)); *see also*

Varity Corp. v. Howe, 516 U.S. 489, 496-497 (1996). Accordingly, "[i]n

determining the contours of an ERISA fiduciary's duty, courts often must look to

the law of trusts." Tibble, 135 S. Ct. at 1828; see alsoVarity, 516 U.S. at 497 ( trust

law offers "a starting point, after which courts must go on to ask whether, or to

what extent, the language of the statute, its structure, or its purposes require

departing from common law trust requirements"); accord Conkright v. Frommert,

559 U.S. 506, 512 (2010); Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,

111 (1989).

26.

Under trust law, "when a beneficiary has succeeded in proving that the

trustee has committed a breach of trust and that a related loss has occurred, the

burden shifts to the trustee to prove that the loss would have occurred in the

absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (2012) (Third

Restatement); *see, e.g.*, George Gleason Bogert & George Taylor Bogert, The Law

of Trusts and Trustees § 871 (rev. 2d ed. 1995) (Bogert) ("If the beneficiary makes

a prima facie case, the burden of contradicting it or showing a defense will shift to

the trustee.").

27.

Applying trust law's burden-shifting framework to ERISA fiduciary-breach claims also furthers ERISA's purposes. In trust law, burden shifting rests on the view that "as between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty." Estate of Stetson, 345 A.2d 679, 690 (Pa. 1975); see also Nedd v. United Mine Workers of Am., 556 F.2d 190, 211 (3d Cir. 1977). ERISA likewise seeks to "protect…the interests of participants in employee benefit plans" by imposing high standards of conduct on plan fiduciaries. 29 U.S.C. 1001(b). Indeed, in some circumstances, ERISA reflects congressional intent to provide more protections than trust law. See, e.g., Varity, 516 U.S. at 497. Applying trust law's burden-shifting framework, which can serve to deter ERISA fiduciaries from engaging in wrongful conduct, thus advances ERISA's protective purposes.

## IV.  **RELEVANT ERISA PROVISIONS**

28.

29 U.S.C. § 1104(a)(1) states:

Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
a)      for the exclusive purpose of:
           (1)    providing benefits to participants and their beneficiaries; and
           (2)    defraying reasonable expenses of administering the plan;

b)      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

c)      by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

d)      in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a)(1). These duties apply to all fiduciary acts alleged below, including but not limited to the Defendants' selection of service providers and investment options for the Plans.

29.

ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B). Accordingly, fiduciaries must vigorously and independently investigate each investment option and service provider with the skill of a prudent investor. They must also continuously monitor plan investments and service providers and promptly dispose of imprudent ones.

30.

Prudence focuses on the process that the fiduciary undertakes in reaching a decision. The Plaintiffs' allegations of wrongdoing by the Defendants originate

directly from the Defendants' own certified annual plan Forms 5500 filed under

penalties of perjury to the U.S Treasury/Internal Revenue Service (IRS) and

Department of Labor (DOL) for the ten (10) plan years of 2009 to 2018 (found at

www.efast.dol.gov). That is, prudence is a test of conduct at the time based on the

Defendant's Annual Reporting filed for the year that they performed the

transactions and procedures, not results. The focus of a court's inquiry is on how

the fiduciary acted. It is judged from the perspective at the time of the decision

rather than from the vantage point of hindsight. A fiduciary's lack of familiarity or

knowledge provides no excuse for a breach of fiduciary duty to use due care.

31.

The duty to conduct an independent investigation into the merits of a

particular investment is the most basic of ERISA's investment fiduciary duties.  A

defined contribution plan fiduciary cannot "insulate itself from liability by the

simple expedient of including a very large number of investment alternatives in its

portfolio and then shifting to the participants the responsibility for choosing among

them." Hecker v. Deere & Co., 569 F.3d 708, 711 (7th Cir. 2009).

32.

 Fiduciaries must "initially determine, and continue to monitor, the prudence

of *each* investment option available to plan participants." DiFelice, 497 F.3d at

423.

33.

ERISA's duty of loyalty requires in relevant part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan. 29 U.S.C. § 1104(a)(l)(A).

34.

The duty of loyalty is "'[p]erhaps the most fundamental duty of a [fiduciary]" and requires fiduciaries to act with an 'eye single' to the interests of plan participants. *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982).

35.

In addition to the duties of loyalty and prudence, fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. §1104(a)(1)(D).

36.

The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered "per se" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)          sale or exchange, or leasing, of any property between the plan and a party in interest;

* * *

(C)          furnishing of goods, services, or facilities between the plan and a party in interest;

(D)          transfer to, or use by or for the benefit of a party in interest, of any assets of the plan...

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

37.

29 U.S.C. § 1109(a) provides in relevant part:

a.  Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

38.

ERISA also provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly  failing to cure any

breach of duty. 29 U.S.C. §1105(a). The statute states, in relevant part, that:

> In addition to any liability which he may have under any other
> provisions of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances:
>    (i)    if he participates knowingly in, or  knowingly undertakes
> to conceal, an act or omission of such other fiduciary, knowing
> such act or omission is a breach; [or]
>    (ii)    if, by his failure to comply with section 1104(a)(1) of this
> title in the administration of his specific responsibilities which give
> rise to his status as a fiduciary, he has enabled such other fiduciary
> to commit a breach; or
>    (iii)    if he has knowledge of a breach by such other fiduciary,
> unless he makes reasonable efforts under the circumstances to
> remedy the breach.

39.

29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action on

behalf of the Plan to rectify a fiduciary's breach of liability as follows: [quote

502(a)(2)]

40.

Likewise, 29 U.S.C. §1132(a)(3) authorizes a plan participant to bring a civil

action individually to rectify a fiduciary's breach of liability as follows: [quote

502(a)(3)]

41.

The Plaintiffs' allegations of wrongdoing by the Defendants originate

directly from the Defendants' own certified annual plan Forms 5500 filed under

penalties of perjury to the Internal Revenue Service (IRS) and Department of

Labor (DOL) for the ten (10) plan years of 2009 to 2018. Defendants' sole

possession of critical plan and trust records such as meeting minutes, investment

policies, board resolutions, etc. limits the Plaintiffs' abilities to ascertain facts and

transactions relating to 1) damages, 2) disloyalties and 3) imprudent behavior of

the Defendants.

42.

29 U.S.C. § 1104 states:

a) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a
   fiduciary shall discharge his duties with respect to a plan solely in the
   interest of the participants and beneficiaries and—
   i) for the exclusive purpose of:
      (1)    providing benefits to participants and their beneficiaries; and
      (2)    defraying reasonable expenses of administering the plan;
   ii) with the care, skill, prudence, and diligence under the circumstances
      then prevailing that a prudent man acting in a like capacity and
      familiar with such matters would use in the conduct of an enterprise of
      a like character and with like aims;
   iii) by diversifying the investments of the plan so as to minimize the risk
      of large losses, unless under the circumstances it is clearly prudent not
      to do so; and
   iv) in accordance with the documents and instruments governing the plan
      insofar as such documents and instruments are consistent with the
      provisions of this subchapter and subchapter III.

## V.    <u>PRELIMINARY STATEMENT</u>

43.

Based on the 2009 Form 5500, the Defendants imprudently selected higher

cost 1) actively managed mutual funds and 2) "retail" share classes versus the

lowest cost "institutional" share class of the same mutual fund. The Plaintiff's

2019 benefit statement shows that the Defendants realized their prior errors and

finally acted to remove the burdensome retail share classes and replace them with

their cheaper institutional share alternatives sometime in 2019.  But their action in

this regard has does nothing to 1) repair the harm to the thousands of separated

employees that withdrew millions of dollars, or 2) repair the accounts of current

employees for the 2014, 2015, 2016, 2017 and 2018 plan years of prohibited

transactions and trust damages.

44.

Per the Defendants' Forms 5500, the Defendants transacted in a prohibited

manner under ERISA by failing to act in accordance with the Plans and trust

documents by alienating trust assets from participants when they made excessive

payments during the ten years of 2009 to 2018 to 1) NFP; 2) James E.

Bashaw/LPL; 3) Alliant and 4) Prudential.

45.

These excessive payments from the trust authorized by the Defendants

violated the Plans and trust documents and jeopardized the Plans' tax exempt status, thus exposing Plaintiffs to significant risks of negative tax consequences.

46.

Defendants further failed to diversify the investments of the plan to minimize the risk of large losses. Over all applicable periods, the Plans' equity funds have a 90% correlation with no provision to make available to participants less-correlated foreign bond, real estate, commodity funds, etc. See Restatement of Trusts, 3rd, Chapter 17, §90: "Because of its importance as a part of the country's capital markets, real estate is a potentially valuable ingredient of a diversification strategy, especially in light of its limited covariance with publicly traded equity and debt securities. Failure to diversify on a reasonable basis in order to reduce uncompensated risk is ordinarily a violation of both the duty of caution and the duties of care and skill."

## VI.   BACKGROUND FACTS

### A.   Defined contribution plans, services, and fees in general

47.

The Plans are defined contribution plans, which are a type of employee retirement plan that allows employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account.

22

Participants direct the plan contributions into one or more investment options in a lineup assembled by the plan's fiduciaries, though participants never actually own the mutual funds they select. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." Tibble v. Edison Int'l, 135 S. Ct. 1823, 1826 (2015).

48.

As trusts, defined contribution plans are under the same anti-alienation provisions that prohibit payments from the trust unless the services are both necessary and the fees are reasonable. Alienation of plan benefits is a direct violation 29 U.S.C. §1104(a)(1)(A) which mandates that a fiduciary "'shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to the participants and beneficiaries and defraying administrative costs." Payments from plans are expressly prohibited unless they qualify for a prohibited transaction class exemption under 29 CFR§2550.408(b)(2)

49.

The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can

23

sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble*, 135 S. Ct. at 1826.

50.

Plan fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring service providers for the Plans, such as a recordkeeper, and for negotiating and approving the amount of fees paid to the service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

51.

These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1–2 (Aug. 2013), available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf. In fact, the lack of investment growth impacts a participant's terminal wealth more than their own hard-earned wages saved into the retirement plan. Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these investment

costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large dollar plans like the Plans, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to such retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

52.

There are two primary methods for defined contribution plans to pay for service provider costs: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively or may use a combination of both direct and indirect payments.

53.

The entities that provide services to defined contribution plans have an incentive to maximize their fees. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

54.

Unchecked asset-based compensation through either direct or indirect payments such as revenue sharing ensures that service providers continually receive unjustified pay increases through contributions and capital appreciation not related to increases in labor and liability.

55.

Fiduciaries must be cognizant of providers' self-interest in maximizing fees and not simply agree to the providers' fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## B.    Defined contribution investment options

56.

Defined contribution fiduciaries such as these Defendants have exclusive power and control over the menu of particular trust investment options available to participants. Plan participants direct and allocate the assets in their accounts to one or more of these options, and the investment returns are credited to participants'

accounts.  Asset allocation is simply a term to describe how a participant divides

and diversifies his/her portfolio among a variety of asset classes, such as stocks,

bonds and stable value.

57.

Each investment option is typically a pooled investment product, such as a

mutual fund, and invests in a diversified portfolio of securities in a broad asset

class such as fixed income or equities. Fixed income funds may include

conservative principal protection options, such as stable value funds, or other

diversified portfolios of government or corporate debt securities. Equity funds

invest in diversified portfolios of stocks of large, mid-size, or small domestic or

international companies in a particular style such as growth or value (or a blend of

the two). Balanced funds invest in a mix of stocks and bonds in varying

percentages.

58.

Investment options can be passively or actively managed. In a passively

managed or "index" mutual fund, the mutual fund manager attempts to match the

performance of a given benchmark index by holding a representative sample of

securities in that index, such as the S&P 500. In an actively managed fund, the

mutual fund manager uses her judgment in buying and selling individual securities

(*e.g.,* stocks, bonds, etc.) in an attempt to generate investment returns that surpass a

benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

59.

The fees of mutual funds and other investment options are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps). (One basis point is equal to 1/100th of one percent (or 0.01%).) The fees deducted from a fund's assets reduce the value of the shares owned by fund investors.

60.

Many mutual funds offer their investors multiple share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

61.

Some mutual funds engage in a practice known as "revenue sharing" (12b-1, sub-transfer agent and shareholder service fees). In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is typically attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of 12b-1 fees and 15 bps of sub-transfer agency fees, while the institutional share charges 60 bps, with significantly less or no revenue sharing. Because revenue sharing is an asset-based fee built into the investment costs, investment and administrative providers are incented to recommend that fiduciaries select share classes of funds that pay revenue sharing as way to surreptitiously continually increase their fees. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" Leimkuehler v. Am. United Life Ins. Co., 713 F.3d 905, 907 (7th Cir. 2013).

62.

When selecting investments, the importance of fees cannot be overstated. Indeed, "the duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule" under the common law of trusts, which informs ERISA's

fiduciary duties. Restatement (Third) of Trusts ch. 17, intro. note (2007); *see*

Tibble, 135 S. Ct. at 1828 (citing Restatement (Third) of Trusts § 90 in finding a

continuing duty to monitor under ERISA). As the Restatement explains, "cost-

conscious management is fundamental to prudence in the investment function."

Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-

cost, actively-managed mutual funds as an alternative to index funds, "active

management strategies involve investigation expenses and other transaction costs

... that must be considered, realistically, in relation to the likelihood of increased

return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id*. §

90 cmt. h(2).

63.

Academic and financial industry literature demonstrates that high expenses

are not correlated with superior investment management. Indeed, funds with high

fees on average perform worse than less expensive funds even on a pre-fee basis.

Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination*

*in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873

(2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities*

*Intermediaries,* 158 U. PA. L. REV. 1961, 1993 (2010) (summarizing numerous

studies showing that "the most consistent predictor of a fund's return to investors is

the fund's expense ratio").

64.

"[T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds." Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

65.

In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2). Nobel Prize winners in economics have concluded that virtually no mutual fund manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management*, 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991), available at

http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7; Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J.

FIN. 1915, 1915 (2010) ("After costs...in terms of net returns to investors, active investment must be a negative sum game.").

66.

To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

67.

If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the worst-performing mutual

funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

68.

Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception that will outperform its benchmark index over time, net of investment expenses. Investments that fail to consistently beat their intended SEC-prospectus benchmark harm participants, are unjustifiable and therefore their costs are prohibited.

### C.    Defined contribution investment management

69.

Held to a prudent standard of care, the Defendants as plan fiduciaries are responsible and liable for the selection and monitoring of investment options. Fiduciaries that recognize they are not qualified to perform those functions may outsource or hire an investment professional to assist with establishing and monitoring the menu of investment options.

70.

Plan level investment professionals may accept varying levels of fiduciary responsibility ranging from none to all. Plan fiduciaries must understand the

difference between investment professionals who only offer investment

recommendations and accept no liability for those recommendations, those that

share liability with the plan fiduciaries and those that accept virtually all liability

for investment decisions. Plan fiduciaries are always responsible for prudent

service provider selection and monitoring of costs in relation to services rendered.

71.

Investment advisors such as Rollins' LPL and Alliant were selected and

must be monitored by the appointing fiduciaries (the Defendants). The Defendants

and the plans' investment advisors both must follow guidelines established by each

plan's investment policy statement (IPS) which outlines who is responsible for the

investment selection and monitoring, the criteria used in the investment selection

and monitoring process and the criteria and process by which funds can or should

be removed and replaced. The IPS is a governing plan document within the

meaning of 29 U.S.C. §1104(a)(1)(D). *See* 29 C.F.R. §2509.08-2(2)(2008)

("Statements of investment policy issued by a named fiduciary authorized to

appoint investment advisors/fiduciaries would be part of the 'documents and

instruments governing the plan' within the meaning of ERISA Sec. 404(a)(1)(D)")

and must be followed by the Defendants under ERISA.

72.

Given their role, investment advisors such as those identified on the

34

Defendants' Forms 5500 Schedules C have, at a minimum, considerable influence over the investment options in a plan. According to the Government Accounting Office (GAO), over 80% of the defined contribution plan expenses come from the investments, often including the investment advisor's own fees. The potential conflict of interest is clear as investment advisors like LPL, Alliant, etc., in many cases, have the ability to set their own compensation through mutual fund soft dollars, revenue sharing sources, "finder's fees".

73.

Investment advisors typically receive compensation through direct or indirect sources as noted above. Direct fees can be in the form of an asset-based charge or flat-rate annual fee. Asset-based fees (where a plan covered service provider (CSP), such as LPL, Prudential, etc. gets paid additional compensation when employees contribute to their accounts) should be continually monitored to ensure that provider costs do not exceed the value of the services a provider renders.

74.

Indirect compensation to providers typically comes from revenue sharing sources such as 12b-1 fees and similar to asset-based direct fees, must be monitored to ensure provider costs do not exceed the value of the services rendered.

## D.     Defined contribution recordkeeping

75.

Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper (i.e., Prudential from at least 2009 to 2019) keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

76.

There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (*e.g.,* recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for large plans.

77.

As noted above, recordkeepers can be paid through direct or indirect payment sources.

78.

In an example of a direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, i.e. $30 per participant. Large defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants, for example, can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

79.

A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

80.

As an example, a fiduciary of a 20,000 participant, $3 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000 participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $4 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

81.

Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge should be used. In that case, the flat per-participant rate of $30 per participant multiplied by the number of

participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. If plan assets increase, the percentage is adjusted downward so that the plan as a whole is still paying the same plan-level price for the negotiated services.

82.

Some plans pay for recordkeeping through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if, as here, it is not properly monitored and capped.

83.

In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset-based, the fees can grow to unreasonable and prohibited levels due to employee and employer contributions along with capital appreciation, interest and dividends, while the number of participants, and thus the services provided, have not increased at a similar rate.

84.

If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary: (a) determine and monitor the amount of the revenue

sharing and any other sources of compensation that the provider has received, (b)

compare that amount to the price that would be available on a flat per-participant

basis, and (c) control the amount of fees paid through recordkeeping by obtaining

rebates of any revenue sharing amounts that exceed the reasonable level of fees.

85.

As to the second critical element—determining the price that would be

available on a flat per-participant basis—making that assessment for a large plan

requires soliciting bids from competing providers. In large plans with over 10,000

participants, benchmarking based on fee surveys alone is inadequate.

86.

Recordkeeping fees for jumbo plans have also declined significantly in

recent years due to increased technological efficiency, competition, and increased

attention to fees by sponsors of other plans such that fees that may have been

reasonable at one time may have become excessive based on current market

conditions. Accordingly, the only way to determine the true market price at a given

time is to obtain competitive bids. *See* George v. Kraft Foods Global, Inc., 641

F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary

judgment based in part on opinion of independent consultant that "'without an

actual fee quote comparison'—*i.e*, a bid from another service provider—

[consultant] 'could not comment on the competitiveness of [recordkeeper's] fee

amount for the services provided.'"").

87.

Prudent fiduciaries of defined contribution plans, thus, obtain competitive bids for recordkeeping at regular intervals of approximately three years. The Defendants did not do this.

## VII.   SPECIFIC BREACHES OF FIDUCIARY DUTY BY DEFENDANTS

### A.    Improper selection and monitoring of Plan service providers

88.

Defendants breached their fiduciary duty in selecting service providers such as the broker dealer LPL where the representative James E. Bashaw cleared commissions/fees from the Plan. Mr. Bashaw, a representative under LPL from 2001-2014, was terminated in 2014 for "FAILURE TO FOLLOW FIRM POLICIES AND INDUSTRY REGULATIONS."  Mr. Bashaw also previously had a "breach of fiduciary" allegation in the year 1988 (*See* Exhibit 1) Mr. Bashaw's background was publicly available to Defendants.  (*See* Exhibit 2). Despite this, Defendants allowed Mr. Bashaw to serve as a Plan fiduciary, and paid him and LPL almost $440,000 between 2010 and 2013 as reported in the Plans' Form 5500s. (*See* Exhibit 3.)

## Exhibit 1

| | |
|---|---|
| **Disclosure 3 of 3** | |
| **Reporting Source:** | Firm |
| **Employing firm when activities occurred which led to the complaint:** | KIDDER PEABODY & CO. |
| **Allegations:** | BREACH OF FIDUCIARY DUTY-CHURNING, OJBECTIVES NOT FOLLOWED CLAIM-$620,000 ACTUAL $1,000,000. PUNITIVE |
| **Product Type:** | |
| **Alleged Damages:** | $620,000.00 |
| **Customer Complaint Information** | |
| **Date Complaint Received:** | |
| **Complaint Pending?** | No |
| **Status:** | Arbitration/Reparation |
| **Status Date:** | |
| **Settlement Amount:** | |
| **Individual Contribution Amount:** | |
| **Arbitration Information** | |
| **Arbitration/Reparation Claim filed with and Docket/Case No.:** | National Association of Securities Dealers, Inc.; 89-1613 |
| **Date Notice/Process Served:** | 06/28/1988 |
| **Arbitration Pending?** | No |
| **Disposition:** | Settled |

©2019 FINRA. All rights reserved. Report about JAMES E. BASHAW.

## Exhibit 2

For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.

| | Pending | Final | On Appeal |
|---|---|---|---|
| Regulatory Event | 0 | 1 | 0 |

©2019 FINRA. All rights reserved. Report about JAMES E. BASHAW.

www.finra.org/brokercheck

| | Pending | Final | On Appeal |
|---|---|---|---|
| Customer Dispute | 0 | 3 | N/A |
| Termination | N/A | 1 | N/A |
| Financial | 1 | 0 | N/A |
| Judgment/Lien | 1 | N/A | N/A |

**Exhibit 3**

|              | 2013     | 2012     | 2011     | 2010     |          |
|--------------|----------|----------|----------|----------|----------|
| Western Ind  | $ 20,484 | $ 25,786 | $ 31,144 | $ 17,346 |          |
| Rollins      | $ 81,076 | $ 96,731 | $ 110,596| $ 56,693 |          |
| Totals       | $ 101,560| $ 122,517| $ 141,740| $ 74,039 | $ 439,856|

89.

Providers are prohibited under ERISA §408(b)(2) from receiving any
compensation unless their services are necessary for operation of the plan. Despite
receiving over $100,000 per year on average between the trusts, Bashaw and LPL
failed to show that they added any material value by maintaining actively managed
predominently retail share class investments. To demonstrate he was acting
prudently and adding value, this FINRA regulated broker should have helped the
Defendants avoid imprudent fund and share classes by using tools such as
FINRA's own free mutual fund cost analyzer to help select prudent investment
options and appropriate share classes for the size of the Plans. (*See* Exhibit 4).

**Exhibit 4**



**FINRA Fund Analyzer** Overview

The **Fund Analyzer** allows individuals to sort through
and compare more than 30,000 products available to
investors today and calculates how a **fund's fees,
expenses** and discounts impact the value of a **fund**
over time.

Using the FINRA Fund Analyzer | FINRA.org
https://www.finra.org › investors › tools-and-calculators › using-finra-fund-a...

90.

Defendants' improper payments to LPL and Mr. Bashaw for work that either was not performed or was not necessary for the administration of the Plan caused a prohibited transaction that should have been reported on Schedules G and Return of Excise Taxes Related to Employee Benefit Plans IRS Form 5330 for multiple plan years.

91.

Defendants' failure to report such prohibited transactions calls into question the adequacy of their audits, the accuracy of their 5500 filings, and whether the auditor's payments from the trusts were valid. Specifically, Windham Brannon should have caught the large and erratic investment advisor payments from the historical 5500 Schedule C records during the periods in which they were engaged to perform a full-scope audit and for which they provided an unqualified opinion.

## B.    Imprudent Plan investment structure

92.

Rollins and Western employees and retirees who participate in the Plans do not decide which investment options are made available to the Plans. It is the Defendants who select and monitor investment options in the Plans, and it is the Defendants who have the responsibility for removing imprudent Plan options.

93.

Defendants, in fact, select, approve and make available a limited menu of investments from over 20,000 choices for use in the Plans' trusts' omnibus account. All employees who become eligible to participate in the Plans must choose from this limited fund list created and maintained by the Defendants and have no control or ability to use investments outside of this limited menu.

94.

Participants have a common trust and custodial account that holds all their securities' interests in aggregated form at a bank affiliated with Prudential. Prudential reconciles the trust's omnibus custodial account after all contributions and distributions are netted against exchanges and fees and then uses this information to update the participants' records they keep for both Plans.  Another Prudential affiliate, Prudential Retirement Services, serves as recordkeeper for the Plans and, in that capacity, per the Defendants' Forms 5500 Annual Reporting, receives indirect mutual fund compensation for aggregating participants' trades daily.

95.

Using the Defendants' Forms 5500 Schedule of Assets from December 31, 2009, all participants in the Plans had access to twelve (12) mutual funds consisting of, among other things, three institutional ("true no-load") funds, one

"institutional" fund with exceptionally high revenue sharing fees and total

expenses, and seven (7) retail mutual funds among the investment options offered

to Plan participants.

96.

Despite the massive size of the Plans, many of the mutual fund options were

high-priced retail share classes designed for small individual investors. The retail

shares are identical in every respect to institutional shares of the same funds,

except that the retail shares charge much higher fees (the codes at the end of each

mutual fund name provides clarity as to which share class was used; e.g., "R4" is

more expensive than the true no-load "R6" share class). Many of the funds with

retail share classes had sufficient assets to meet the minimum initial investment

requirements to obtain their otherwise identical, but less expensive institutional

share classes.  Mutual fund minimum purchase amounts are merely guidelines and

almost always waived upon request by the plan administrator (the Defendant) of

the plan.

97.

Retail share classes that utilize revenue sharing not only reduce returns, they

also suffer from inefficiencies known as "friction". The cumulative excess costs of

revenue sharing, lagging returns and inefficiencies over a five year period of time is

significant (*see* Exhibit 5).

**Exhibit 5**

| The Cumulative Cost of Revenue Sharing | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Average Annualized Returns (Ending 12/31/18) | | | Cumulative Total Returns (Ending 12/31/18) | | | |
| Fund Name | 2013 Assets* | Expense Ratio | 12b-1 | Yield 12-Month (%) | Yield 12-Month ($) | 1-Year % | 3-Year % | 5-Year % | 3-Year % | 3-Year $ | 5-Year % | 5-Year $ |
| American Funds Capital World Gr&Inc R4 | $9,333,327 | 0.79 | 0.25 | 2.28 | $212,800 | -10.30 | 5.99 | 3.90 | 19.07 | $11,113,192 | 21.08 | $11,300,792 |
| American Funds Capital World Gr&Inc R6 | | 0.45 | | 2.68 | $250,133 | -9.97 | 6.36 | 4.26 | 20.32 | $11,229,859 | 23.19 | $11,497,726 |
| Cost of Revenue Sharing | | -0.34 | -0.25 | -0.40 | -$37,333 | -0.33 | -0.37 | -0.36 | -1.25 | -$116,667 | -2.11 | -$196,933 |
| | | | | | | | | | | | | |
| American Funds Europacific Growth R4 | $21,817,113 | 0.83 | 0.25 | 1.30 | $283,622 | -15.22 | 3.72 | 1.50 | 11.58 | $24,343,535 | 7.73 | $23,503,576 |
| American Funds Europacific Growth R6 | | 0.49 | | 1.70 | $370,891 | -14.91 | 4.08 | 1.86 | 12.75 | $24,598,795 | 9.65 | $23,922,464 |
| Cost of Revenue Sharing | | -0.34 | -0.25 | -0.40 | -$87,268 | -0.31 | -0.36 | -0.36 | -1.17 | -$255,260 | -1.92 | -$418,889 |
| | | | | | | | | | | | | |
| Franklin Growth Adv | $41,045,314 | 0.62 | | 0.76 | $311,944 | -3.15 | 10.20 | 9.51 | 33.83 | $54,930,944 | 57.50 | $64,646,370 |
| Franklin Growth R6 | | 0.49 | | 0.86 | $352,990 | -3.06 | 10.36 | 9.68 | 34.41 | $55,169,007 | 58.72 | $65,147,122 |
| Cost of Revenue Sharing | | -0.13 | 0.00 | -0.10 | -$41,045 | -0.09 | -0.16 | -0.17 | -0.58 | -$238,063 | -1.22 | -$500,751 |
| | | | | | | | | | | | | |
| Goldman Sachs Mid Cap Value A | $12,760,070 | 1.22 | 0.25 | 0.45 | $57,420 | -10.84 | 3.65 | 2.68 | 11.35 | $14,208,338 | 14.14 | $14,564,344 |
| Goldman Sachs Mid Cap Value Insti | | 0.83 | | 0.85 | $108,461 | -10.48 | 4.07 | 3.10 | 12.71 | $14,381,875 | 16.49 | $14,864,206 |
| Cost of Revenue Sharing | | -0.39 | -0.25 | -0.40 | -$51,040 | -0.36 | -0.42 | -0.42 | -1.36 | -$173,537 | -2.35 | -$299,862 |
| | | | | | | | | | | | | |
| Oakmark Equity And Income Service | $30,775,621 | 1.05 | | 1.38 | $424,704 | -8.57 | 4.91 | 3.20 | 15.47 | $35,536,610 | 17.06 | $36,025,942 |
| Oakmark Equity And Income Investor | | 0.78 | | 1.74 | $535,496 | -8.33 | 5.20 | 3.50 | 16.43 | $35,832,056 | 18.77 | $36,552,205 |
| Cost of Revenue Sharing | | -0.27 | 0.00 | -0.36 | -$110,792 | -0.24 | -0.29 | -0.30 | -0.96 | -$295,446 | -1.71 | -$526,263 |

\* For illustration purposes, each fund's 12/31/13 assets are applied to all return periods.

Notes:
1. Share classes of a mutual fund portfolio share the same portfolio managers and investments and are otherwise identical with the possible exceptions of a) costs, b) performance as a consequence of costs, c) minimum investment requirements and d) inception dates.
2. Higher share class costs adversely affects the returns of that share class available

Due to the inefficiencies ("friction"), revenue sharing negatively impacts mutual fund returns:
The additional cost of revenue sharing for the funds listed above is:
Average 3-Year Difference: **0.10%**
Average 5-Year Difference: **0.25%**

The cumulative cost of revenue sharing for the five funds listed above is:
Cumulative 3-Year Cost Difference: **$1,078,973**
Cumulative 5-Year Cost Difference: **$1,942,699**

98.

Beginning in 2009, all participants in the Plans were given access to "GoalMaker" model portfolios from Prudential Retirement that are a series of aggregated portfolios made up of selected Plan investment options and allocated according to risk tolerance. These portfolios are made up of the investments within the Plans that were chosen by the Defendants. The GoalMaker models are made up entirely of actively managed funds in which at least half of the options selected by the Defendants were held in retail share classes through 2018. The GoalMaker models were also selected by the Defendants to replace the Dodge & Cox Balanced fund as the Qualified Default Investment Alternative for participants who prefer to

have investment selection and allocation decisions made for them, or for those who do not make any decision.

99.

Defendants failed in their "duty to avoid excessive costs". The Restatement of the Law Third, Trusts: Prudent Investor Rule states that: "The greater the trustee's departure from one of the valid passive strategies, the greater is likely the to be the burden of justification and also of continuous monitoring." Participants, including Fleming and the Class members, who defaulted into the GoalMaker models were harmed financially for at least the past decade due to the imprudent and expensive retail share classes selected by the Defendants. A prudent fiduciary would have sought low-cost passively managed investments and invested in the institutional-class shares for each mutual fund rather than have remained in retail-class shares.

100.

Based on the Defendants' failure to conduct appropriate due diligence in selecting and removing/retaining the Plans' investments, numerous investment options historically underperformed and carried significantly more risk of lagging their prospectus benchmarks, while other lower-cost institutional share alternatives tracked their benchmarks precisely and were available to the Defendants to use in the Plans even before 2009. Defendants were aware of institutional share

availability.

## C.    Imprudent selection and monitoring of other Plan investments

### 101.

Defendants limited the participants' choices so that over 90% of the fund

menu options (per the 2009 and 2014 Form 5500s) were high cost/high turnover

actively managed funds that have extremely limited chances to beat their U.S.

Securities & Exchange Commission (SEC) prospectus benchmark over decades

when individual participants' investment horizons averaged about five years in

total.

### 102.

As they are statistically unlikely to overcome the burdensome costs and

much less measurably beat the benchmark, the costly funds, selected by

Defendants and borne by participants, significantly reduced the trusts' growth and

the participants' terminal wealth for many years to come.

### 103.

Defendants should have monitored these investments more diligently and

removed them more quickly given that, on average, 20% of Rollins employees left

the company in the five year period between 2014 and 2018.  About $250 million

left the Plan due to those employee separations during that period and that

represents assets of participants who have been irreparably harmed by excessive

costs and imprudent investments.

104.

Funds chosen by Defendants cost about $1,300,000 in expenses during plan year 2014 based on the ending balances found in the December 31, 2013 audited financials. Funds were available that replicated the benchmarks' returns for under $300,000 which would have saved the participants at least $1,000,000 in expenses and avoided active manager risk in that one year alone.

105.

Defendants continually invested in high cost mutual funds like the Victory Diversified Stock A (SRVEX) and Goldman Sachs Mid Cap Value A (GCMAX) etc. The Victory Diversified Stock portfolio held only 81 stocks which causes this fund to have a higher standard deviation than the S&P 500 Index. The standard deviation of the manager's alpha (alpha represents the performance of a portfolio relative to a benchmark) is almost 15 times that of the S&P 500 index (its prospectus benchmark chosen by the portfolio manager and from which the manager's bonus is derived). This means that when the fund lost 37% in 2008, it needed not a 37% return to break even (because investment gains and losses are calculated geometrically not arithmetically) but almost 60% (37/63). This is significant when there is a lack of portfolio diversification to recover from large losses like those suffered in the "great recession" in 2008.

106.

To put it another way, Defendants ensured the participants' biweekly contributions and the associated matched dollars were repeatedly bet on the horse with a 600lb jockey (100 basis points or ~1%/yr fund costs) versus betting on a horse with a 60lb jockey (i.e., carrying only 10 basis point average annual cost.

107.

Defendants should not have chosen the high cost active funds (much less the higher cost share class of that same costly active fund). Defendants improperly made available to participants only one (1) passive fund until 2015 when four more passive funds were added.

108.

Additionally, the yellow highlighted funds in Exhibit 6 were imprudent and should have never been added because their alpha was either not exhibited or not consistent enough to prove the managers have skill when analyzing their returns in rolling six-month performance periods since either their inception or back to the 1970s.

**Exhibit 6**

| Name | Symbol | 5500 Inclusion Period |
|---|---|---|
| *Alger Mid Cap Growth Institutional I | ALMRX | 2009-2010 |
| American Funds Growth Fund of Amer R4 | RGAEX | 2009-2011 |
| Victory Diversified Stock A | SRVEX | 2009-2011 |
| DWS Small Cap Core A | SZCAX | 2009-2011-kdsax merge |
| *PIMCO Total Return Instl | PTTRX | 2009-2014 |
| Goldman Sachs Mid Cap Value A | GCMAX | 2009-2015 |
| American Funds Capital World Gr&Inc R4 | RWIEX | 2009-2018 |
| American Funds Europacific Growth R4 | REREX | 2009-2018 |
| Oakmark Equity And Income Service | OARBX | 2009-2018 |
| T. Rowe Price New Horizons | PRNHX | 2009-2018 |
| *Vanguard 500 Index Admiral | VFIAX | 2009-2018 |
| *Vanguard Windsor™ II Admiral™ | VWNAX | 2009-2018 |
| *Morgan Stanley Inst Mid Cap Growth I | MPEGX | 2011-2015 |
| Franklin Growth Adv | FCGAX | 2011-2018 |
| *Vanguard Total Bond Market Index Adm | VBTLX | 2012-2018 |
| *Victory Sycamore Small Company Opp I | VSOIX | 2012-2018 |
| *Metropolitan West Total Return Bd I | MWTIX | 2015-2018 |
| *Vanguard Mid Cap Index Admiral | VIMAX | 2015-2018 |
| *Vanguard Small Cap Index Adm | VSMAX | 2015-2018 |
| *Vanguard Total Stock Mkt Idx Adm | VTSAX | 2015-2018 |
| *Hartford MidCap R6 | HFMVX | 2016-2018 |
| *Victory Sycamore Established Value R6 | VEVRX | 2016-2018 |
| Retail | Active | |
| Institutional=* | Passive | |

109.

Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the readily available lower-cost share class mutual fund options or even better passively managed options, Plan participants would not have lost millions of dollars of their retirement savings.

110.

Prior to 2009, Defendants chose the T. Rowe Price New Horizon fund that, according to its prospectus-stated objective and Russell 2000 Growth prospectus

benchmark, was supposed to fill a portfolio's "small cap growth" category. However, Defendants failed to monitor this fund prudently and, therefore, overlooked (if not ignored) that the manager deviated from the fund's stated objective to cause it to drift into a mid-cap stock category (*see* Exhibit 7). As a result, participants who thought they were diversifying by putting some dollars into small stocks and mid-size stocks became potentially overweighted in the mid-cap categories.

### Exhibit 7



| Fund/ETF Profile: T. Rowe Price New Horizons | | | | | | | | | | | Ticker: PRNHX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/31/2015 | 6/30/2015 | 9/30/2015 | 12/31/2015 | 3/31/2016 | 6/30/2016 | 9/30/2016 | 12/31/2016 | 3/31/2017 | 6/30/2017 | 9/30/2017 | 12/31/2017 |
| Peer Group | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth | Small Growth |
| Manager Tenure (in) | 5.08 yrs ✓ | 3.33 yrs ✓ | 5.59 yrs ✓ | 5.84 yrs ✓ | 6.05 yrs ✓ | 6.34 yrs ✓ | 6.59 yrs ✓ | 6.84 yrs ✓ | 7.05 yrs ✓ | 7.34 yrs ✓ | 7.59 yrs ✓ | 7.84 yrs ✓ |
| Net Assets (in) | 15,974.73 ✓ | 16,318.13 ✓ | 15,515.23 ✓ | 15,332.73 ✓ | 13,633.13 ✓ | 15,709.88 ✓ | 16,807.29 ✓ | 17,177.76 ✓ | 18,138.06 ✓ | 11,933.74 ✓ | 25,549.84 ✓ | 22,300.71 ✓ |
| Style | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ | Mid Growth ✗ |

### D.    Imprudent fund replacement

111.

Prior to 2009, the Dodge and Cox Balanced Fund (DODBX) was the Qualified Default Investment Alternative ("QDIA") for the Plan, *i.e.,* the default investment vehicle for participants who did not make an affirmative selection of investments. Created in 1931, DODBX is the oldest balanced fund in America and is notable for historical high relative returns, relatively low costs and low portfolio turnover.

112.

According to the Rollins 2009 Form 5500, Defendants replaced DODBX with Oakmark Equity And Income Fund (OARBX).  This is so even though OARBX had fewer than 15 years of performance history and was twice as expensive as the DODBX fund at the time the conduct was performed.  If a fund change was mandated by the IPS, Defendants should have sought a lower cost option such as the Vanguard Balanced Index.

113.

In addition, OARBX generated 0.35% in shareholder servicing fees (a form of revenue sharing), which amounted to significant "indirect payments." These payments were problematic because they were based on assets so the service provider fees increased annually due, in large part, simply to contributions, not an increase in labor or liability.  For example, in 2009, OARBX's 0.35% revenue sharing fee generated $66,000 based on the assets held in the fund at the end of the year ($18,929,283), at the end of 2017, OARBX's servicing fee of 0.35% generated nearly $134,000 in fees (based on EOY assets of $38,268,822) ultimately borne by Plan participants and beneficiaries.

114.

Not only did Defendants choose the wrong fund to replace the oldest balanced fund, they also chose the wrong share class of that fund itself.  To compound the

problem, Defendants also chose the wrong time to make the change as OARBX's short period of outperformance over DODBX just prior to the fund change gave way to underperfomance in eight of the next ten years. Defendants' imprudent decision of replacing DODBX cost participants over $10 million through 2018 (*see* Exhibits 8 and 9).

### Exhibit 8

| The Cumulative Cost of Poor Investment Selection | | | | | | |
|---|---|---|---|---|---|---|
| | | | Annual Total Returns | | | |
| | Expense | 2009 BY | | | 2010 BY | | |
| Fund Name | Ratio | Assets | 2009 (%) | 2009 ($) | Assets | 2010 (%) | 2010 ($) |
| Oakmark Equity And Income Service | 1.05 | $13,124,347 | 19.47% | $15,679,657 | $18,929,283 | 9.17% | $20,665,098 |
| Dodge & Cox Balanced | 0.53 | | 28.37% | $16,847,724 | | 12.22% | $21,242,441 |
| Vanguard Balanced Index Inv* | 0.18 | | 20.05% | $15,755,779 | | 13.13% | $21,414,698 |
| Annual Return Difference (OARBX vs DODBX) | | | -8.90% | -$1,168,067 | | -3.05% | -$577,343 |
| Annual Return Difference (OARBX vs VBINX) | | | -0.58% | -$76,121 | | -3.96% | -$749,600 |
| | Expense | 2011 BY | | | 2012 BY | | |
| Fund Name | Ratio | Assets | 2011 (%) | 2011 ($) | Assets | 2012 (%) | 2012 ($) |
| Oakmark Equity And Income Service | 1.05 | $22,718,324 | 0.27% | $22,779,663 | $22,951,449 | 8.75% | $24,959,701 |
| Dodge & Cox Balanced | 0.53 | | -1.66% | $22,341,200 | | 18.32% | $27,156,154 |
| Vanguard Balanced Index Inv | 0.18 | | 4.14% | $23,658,863 | | 11.33% | $25,551,848 |
| Annual Return Difference (OARBX vs DODBX) | | | 1.93% | $438,464 | | -9.57% | -$2,196,454 |
| Annual Return Difference (OARBX vs VBINX) | | | -3.87% | -$879,199 | | -2.58% | -$592,147 |
| | Expense | 2013 BY | | | 2014 BY | | |
| Fund Name | Ratio | Assets | 2013 (%) | 2013 ($) | Assets | 2014 (%) | 2014 ($) |
| Oakmark Equity And Income Service | 1.05 | $25,056,818 | 23.83% | $31,027,858 | $30,775,621 | 6.59% | $32,803,734 |
| Dodge & Cox Balanced | 0.53 | | 28.37% | $32,165,437 | | 8.87% | $33,505,419 |
| Vanguard Balanced Index Inv | 0.18 | | 17.91% | $29,544,494 | | 9.84% | $33,803,942 |
| Annual Return Difference (OARBX vs DODBX) | | | -4.54% | -$1,137,580 | | -2.28% | -$701,684 |
| Annual Return Difference (OARBX vs VBINX) | | | 5.92% | $1,483,364 | | -3.25% | -$1,000,208 |
| | Expense | 2015 BY | | | 2016 BY | | |
| Fund Name | Ratio | Assets | 2015 (%) | 2015 ($) | Assets | 2016 (%) | 2016 ($) |
| Oakmark Equity And Income Service | 1.05 | $34,662,072 | -4.90% | $32,963,630 | $32,634,012 | 10.63% | $36,103,007 |
| Dodge & Cox Balanced | 0.53 | | -2.87% | $33,667,271 | | 16.56% | $38,038,204 |
| Vanguard Balanced Index Inv | 0.18 | | 0.37% | $34,790,322 | | 8.63% | $35,450,327 |
| Annual Return Difference (OARBX vs DODBX) | | | -2.03% | -$703,640 | | -5.93% | -$1,935,197 |
| Annual Return Difference (OARBX vs VBINX) | | | -5.27% | -$1,826,691 | | 2.00% | $652,680 |
| | Expense | 2017 BY | | | 2018 BY | | |
| Fund Name | Ratio | Assets | 2017 (%) | 2017 ($) | Assets | 2018 (%) | 2018 ($) |
| Oakmark Equity And Income Service | 1.05 | $34,769,152 | 14.15% | $39,688,987 | $38,268,822 | -8.57% | $34,989,184 |
| Dodge & Cox Balanced | 0.53 | | 12.59% | $39,146,588 | | -4.62% | $36,500,802 |
| Vanguard Balanced Index Inv | 0.18 | | 13.75% | $39,549,910 | | -2.97% | $37,132,238 |
| Annual Return Difference (OARBX vs DODBX) | | | 1.56% | $542,399 | | -3.95% | -$1,511,618 |
| Annual Return Difference (OARBX vs VBINX) | | | 0.40% | $139,077 | | -5.60% | -$2,143,054 |

* Higher cost share class used for illustrative purposes

**Exhibit 9**

| The Cumulative Cost of Poor Investment Selection Annualized Returns | | | | | | |
|---|---|---|---|---|---|---|
| Fund Name | Expense Ratio | 2009 BY Assets | 10-Year Cumulative Return - 2009 - 2018 | | | |
| | | | CR (%) | CR ($) | CR +/- (%) | CR +/- ($) |
| Oakmark Equity And Income Service | 1.05% | $13,124,347 | 106.12% | $27,052,074 | | |
| Dodge & Cox Balanced | 0.53% | | 184.81% | $37,379,346 | 78.69% | $10,327,273 |
| Vanguard Balanced Index Inv | 0.18% | | 145.41% | $32,208,444 | 39.29% | $5,156,370 |

115.

In 2015, Defendants replaced the PIMCO Total Return Instl Fund (PTTRX) with the Metropolitan West Total Return I Fund (MWTIX).  This is so even though PTTRX, unlike MWTIX, did not pay any shareholder service fees, sub-transfer agency fees or 12b-1 fees.

## E.    Failure to Diversify

116.

In 2014, investment choices for the Rollins and Western employees did not include low correlation investments such as short-term government bonds, global bonds, emerging markets, emerging markets bonds and commodities, etc.

117.

Unlike the multiple fixed income asset classes illustrated in the correlation matrix (*see* Exhibit 10), Defendants offered participants just one fixed income mutual fund: PIMCO Total Return Instl (PTTRX).

**Exhibit 10**

### Appendix A: Capital Market Inputs

Capital Market Data last updated December 31, 2014.  Returns include a default inflation rate of 2%.
Copyright (c) 2015 New Frontier Advisors, LLC

| | Return (%) | Risk (%) | Underlying Index | Peer Group |
|---|---|---|---|---|
| Large Cap Equity | 8.7 | 15.6 | SBBI Large Company Stocks | Large Blend |
| Mid Cap Equity | 9.1 | 17.6 | Russell Mid Cap | Mid-cap Blend |
| Small Cap Equity | 9.5 | 21.5 | SBBI Small Company Stocks | Small Blend |
| International Equity | 9.2 | 17.5 | MSCI EAFE | Foreign Large Blend |
| Emerging Market Equity | 10.1 | 23.8 | MSCI Emerging Markets | Diversified Emerging Markets |
| REITs | 7.5 | 19.0 | DJ US Select REIT | Real Estate |
| High Yield Bond | 4.8 | 8.3 | Credit Suisse High Yield Bond Index | High Yield Bond |
| Long-term Bond | 3.9 | 10.0 | Barcap U.S. Long  Gov/Credit Bond | Long Term Bond |
| Intermediate-term Bond | 3.3 | 4.5 | Barcap U.S. Interm. Gov/Credit Bond | Intermediate Term Bond |
| International Bond | 3.9 | 10.4 | Citigroup World Gov Bond ex US | World Bond |
| Commodities | 2.0 | 19.8 | Gold, London PM Fix | Equity Precious Metals |
| Money Market | 2.9 | 1.2 | SBBI 30 day US Treasury Bill | Money Market Taxable |

### Correlation Matrix

| | LCE | MCE | SCE | IE | EM | REIT | HY | LTB | ITB | IB | MO | CO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Large Cap Equity (LCE) | 1.00 | 0.93 | 0.76 | 0.64 | 0.67 | 0.60 | 0.61 | 0.26 | 0.23 | 0.08 | 0.14 | 0.02 |
| Mid Cap Equity (MCE) | 0.93 | 1.00 | 0.88 | 0.63 | 0.70 | 0.68 | 0.68 | 0.25 | 0.22 | 0.07 | 0.11 | 0.06 |
| Small Cap Equity (SCE) | 0.76 | 0.88 | 1.00 | 0.53 | 0.65 | 0.66 | 0.66 | 0.14 | 0.12 | -0.01 | 0.08 | 0.04 |
| International Equity (IE) | 0.64 | 0.63 | 0.53 | 1.00 | 0.67 | 0.47 | 0.51 | 0.19 | 0.19 | 0.46 | 0.13 | 0.19 |
| Emerging Market Equity (EM) | 0.67 | 0.70 | 0.65 | 0.67 | 1.00 | 0.49 | 0.55 | 0.11 | 0.10 | 0.15 | 0.05 | 0.23 |
| REITs (REIT) | 0.60 | 0.68 | 0.66 | 0.47 | 0.49 | 1.00 | 0.61 | 0.24 | 0.20 | 0.12 | 0.06 | 0.06 |
| High Yield Bond (HY) | 0.61 | 0.68 | 0.66 | 0.51 | 0.55 | 0.61 | 1.00 | 0.36 | 0.33 | 0.16 | 0.10 | 0.08 |
| Long-term Bond (LTB) | 0.26 | 0.25 | 0.14 | 0.19 | 0.11 | 0.24 | 0.36 | 1.00 | 0.87 | 0.44 | 0.31 | 0.05 |
| Intermediate-term Bond (ITB) | 0.23 | 0.22 | 0.12 | 0.19 | 0.10 | 0.20 | 0.33 | 0.87 | 1.00 | 0.51 | 0.42 | 0.07 |
| International Bond (IB) | 0.08 | 0.07 | -0.01 | 0.46 | 0.15 | 0.12 | 0.16 | 0.44 | 0.51 | 1.00 | 0.18 | 0.30 |
| Money Market (MM) | 0.14 | 0.11 | 0.08 | 0.13 | 0.05 | 0.06 | 0.10 | 0.31 | 0.42 | 0.18 | 1.00 | -0.12 |
| Commodities (CO) | 0.02 | 0.06 | 0.04 | 0.19 | 0.23 | 0.06 | 0.08 | 0.05 | 0.07 | 0.30 | -0.12 | 1.00 |

118.

In 2015, the Defendants removed PTTRX and replaced it with the

Metropolitan West Total Return Bd I (MWTIX).  Participants had no other low-

correlation bonds to choose from (short term, long term or international bonds) or

other low-correlation investment choices (REITs, emerging market, etc.).

119.

Long term bond index funds (LTBs) have a low correlation (0.26%

coefficient) and diversifies quite well with "large cap equity" (LCE). Moreover,

LTBs have comparatively higher yields, are virtually safe from default, and, while

circumstantial, they have returned over 20% year to date. (*See* Exhibit 11).

**Exhibit 11**



120.

Exhibit 12 shows that as far back as the newest fund's inception date (2002), there is a 91% correlation coefficient in daily returns, therefore offering little diversification.

**Exhibit 12**

Correlation Analysis

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Date | 6/27/2002 | | | | | | | | | | | |
| End Date | 9/9/2019 | | | | | | | | | | | |
| Correlation Basis | Daily Returns | | | | | | | | | | | |

Asset Correlations          91% correlation average

| Name | Ticker | ALMRX | RGAEX | SRVEX | SZCAX | GCMAX | RWIEX | REREX | OARBX | PRNHX | VFIAX | VWNAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alger Mid Cap Growth Institutional I | ALMRX | - | 0.95 | 0.922 | 0.917 | 0.924 | 0.868 | 0.833 | 0.883 | 0.953 | 0.92 | 0.893 |
| American Funds Growth Fund of Amer R4 | RGAEX | 0.95 - | | 0.968 | 0.909 | 0.944 | 0.927 | 0.886 | 0.925 | 0.934 | 0.971 | 0.95 |
| Victory Diversified Stock A | SRVEX | 0.922 | 0.968 - | | 0.903 | 0.947 | 0.905 | 0.857 | 0.919 | 0.911 | 0.979 | 0.965 |
| DWS Small Cap Core A | SZCAX | 0.917 | 0.909 | 0.903 - | | 0.933 | 0.845 | 0.803 | 0.88 | 0.947 | 0.905 | 0.898 |
| Goldman Sachs Mid Cap Value A | GCMAX | 0.924 | 0.944 | 0.947 | 0.933 - | | 0.898 | 0.846 | 0.922 | 0.923 | 0.959 | 0.96 |
| American Funds Capital World Gr&Inc R4 | RWIEX | 0.868 | 0.927 | 0.905 | 0.845 | 0.898 - | | 0.974 | 0.878 | 0.843 | 0.908 | 0.914 |
| American Funds Europacific Growth R4 | REREX | 0.833 | 0.886 | 0.857 | 0.803 | 0.846 | 0.974 - | | 0.84 | 0.804 | 0.852 | 0.856 |
| Oakmark Equity And Income Service | OARBX | 0.883 | 0.925 | 0.919 | 0.88 | 0.922 | 0.878 | 0.84 - | | 0.874 | 0.911 | 0.913 |
| T. Rowe Price New Horizons | PRNHX | 0.953 | 0.934 | 0.911 | 0.947 | 0.923 | 0.843 | 0.804 | 0.874 - | | 0.917 | 0.892 |
| Vanguard 500 Index Admiral | VFIAX | 0.92 | 0.971 | 0.979 | 0.905 | 0.959 | 0.908 | 0.852 | 0.911 | 0.917 - | | 0.985 |
| Vanguard Windsor II Admiral | VWNAX | 0.893 | 0.95 | 0.965 | 0.898 | 0.96 | 0.914 | 0.856 | 0.913 | 0.892 | 0.985 - | |

121.

The DOL has long-established that 404(c) safe harbor provisions do not insulate from liability those plan fiduciaries who select imprudent investment options and does not relieve plan fiduciaries from their duty to prudently select and monitor investment funds offered under their 401(k) plan [29 CFR section 2550.404c-1(d)(2)(iv)]. In re YRC Worldwide, Inc. ERISA Litig., No. 09-2593-JWL, 2011 WL 1457288, at *2–4 (D. Kan. Apr. 15, 2011).

## F.    Excessive Fees

### 122.

Participants' contributions and related matching dollars deposited from 2014 to 2018 totalled $200,054,143. These contributions went into the retail revenue sharing mutual funds. These funds' management companies had a selling agreement with Prudential for the average U.S. Securities & Exchange Commission (SEC) Rule 12b-1 fees of 0.25% to be paid to Prudential and an average 0.13% would be paid for service and sub-transfer agency fees every year.

### 123.

These fees were not necessary for the operation of the Plans and in no way benefit the participants and their beneficiaries.  To illustrate, funds like Vanguard 500 Index, an option in the Plans since at least 2009, do not pay any of these fees.

### 124.

Plaintiffs did not receive revenue sharing credits and alleges that Defendants allowed the Plans' recordkeeping costs to be paid from asset-based revenue sharing sources rather than by the number of participants. This arrangement allowed Prudential to potentially receive systematic pay increases from both Plans due, in large part, to participant contributions, employer matches and capital appreciation, dividends and interest.

125.

Prudential's per participant recordkeeping fees increased 88% from 2009

through 2018, while the number of participants increased by just 48% (*See* Exhibit

13).   As recordkeeping costs are directly correlated to the number of participants,

there is no justification for the Plans to have uncapped asset-based compensation.

This is prohibited and should have been reported on the Schedule H, line 4d,

Schedule G and IRS Form 5330 for each year in which the overpayment to

Prudential occurred.

**Exhibit 13**

| bal/part | | pru "asset-based" fee | | pru 5500 direct fm trust | | pru total | | cont/part | | #parts | | cont | | plan year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60,490.20 | $ | 120.98 | $ | 44.17 | $ | 165.15 | $ | 4,484.78 | | 11,474 | $ | 51,458,401.00 | | 2018 |
| 57,637.18 | $ | 115.27 | $ | 10.76 | $ | 126.03 | $ | 3,788.41 | | 10,731 | $ | 40,653,427.00 | | 2017 |
| 50,699.62 | $ | 101.40 | $ | 10.79 | $ | 112.19 | $ | 3,752.42 | | 10,351 | $ | 38,839,381.00 | | 2016 |
| 53,493.79 | $ | 106.99 | $ | 11.98 | $ | 118.97 | $ | 4,185.04 | | 8,809 | $ | 36,866,046.00 | | 2015 |
| 45,087.38 | $ | 90.17 | $ | 10.63 | $ | 100.80 | $ | 3,433.11 | | 9,390 | $ | 32,236,888.00 | | 2014 |
| 41,135.52 | $ | 82.27 | $ | 9.65 | $ | 91.93 | $ | 3,466.32 | | 8,804 | $ | 30,517,472.00 | | 2013 |
| 42,566.65 | $ | 85.13 | $ | 8.53 | $ | 93.66 | $ | 3,339.55 | | 8,508 | $ | 28,412,851.00 | | 2012 |
| 44,589.64 | $ | 89.18 | $ | 55.71 | $ | 144.89 | $ | 3,446.04 | | 8,122 | $ | 27,988,774.00 | | 2011 |
| 45,628.96 | $ | 91.26 | $ | 52.77 | $ | 144.03 | $ | 2,977.96 | | 7,937 | $ | 23,636,105.00 | | 2010 |
| 25,721.21 | $ | 51.44 | $ | 36.32 | $ | 87.76 | $ | 3,379.60 | | 7,765 | $ | 26,242,626.00 | | 2009 |

126.

In 2014, Defendants permitted a direct payment from the omnibus trust

account to Prudential in the amount of $99,770, in addition to the indirect sources

noted in box 2(f) below that Prudential also received. Four years later, that same

direct payment to Prudential increased to $506,841, while the indirect

compensation remained. (*See* Exhibits 14 and 15).

## Exhibit 14



## Exhibit 15

127.

Defendants allowed Prudential to take $506,841 directly from the omnibus

trust account and still receive "indirect payments." Estimated indirect payments in

2018 are calculated to be approximately $368,500, excluding the two Victory

funds for which no share class information was given in the 5500 form (*See* Exhibit 16).

**Exhibit 16**

| 2018 Estimated Revenue Sharing Payments to Prudential | | | |
|---|---|---|---|
| *Source* | *Assets* | *Revenue Sharing (%)* | *Revenue Sharing ($)* |
| Franklin Growth Adv | $65M | 0.13% | $    84,500 |
| Oakmark Equity and Income Service | $33M | 0.33% | $  108,000 |
| American Funds EuroPacific | $44M | 0.33% | $  145,000 |
| American Funds Capital World Gr & Inc | $9.5M | 0.33% | $    31,000 |
| Victory Sycamore Established Value | $20M | N/A | - |
| Victory Small Company Opp | $3M | N/A | - |
| *Total* | | | *$    368,500* |

128.

The www.401ksource.com 401k Averages Book, 17th edition, indicates that $54 per annum per participant is considered a high recordkeeping cost for plans with assets above $100M.

129.

Rollins' 2018 total fee to Prudential of $875,000 divided by the 12,463 participants with account balances equals $70 per annum per participant. This is 30% over the high fee threshold listed in the 401k Averages Book.

130.

Defendants failed to follow a prudent process to ensure a rational basis existed for service provider compensation and, in doing so, allowed excessive and

arbitrary payments to the investment fiduciaries.

131.

Defendants never checked "YES" For "non-exempt transactions with a party in interest" on Schedules H, line 4d for all plan years. To avoid checking "YES," fees must be "necessary for operation of the plan" and if so, they must be "reasonable" meaning the provider can make a reasonable profit and must disgorge excesses back to the trust to avoid a United States Department of Labor (DOL) tax of 20% or U.S. Treasury/Internal Revenue Service (IRS) prohibited transaction excise tax of 15% per plan year involved.

132.

As illustrated in Exhibit 17, at "D" the managers' lag behind their own funds' prospectus benchmarks totaled $12,888,776. The portion of that lag due to wasted managers' fees equals $2,677,884. Where a manager's costs provide no value to Plan participants, these fees are not necessary and therefore prohibited transactions that should be rebated to Plan participants investing in this fund by the Defendants.

**Exhibit 17**



133.

Defendants permitted arbitrary payments to service providers to the Plans.

For example, Prudential was paid $115,412 in direct compensation for

recordkeeping services provided to the Rollin's plan in 2017 but their direct

compensation increased to $506,841 in 2018. In another example, National

Financial Partners (NFP) received a direct payment of $59,162 in 2009 for Code

27 Investment Advisory services to the Rollin's plan. Two years later, LPL was

paid $110,596 for performing the same function. Consequently, Defendants

approved an 87% pay increase to a new investment advisor that added no

additional value or performed additional work: the investment menu remained virtually the same.

134.

Defendants failed to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent" with ERISA. 29 U.S.C. §1104(a)(1)(D) and allowed trust assets to be alienated. These "unnecessary" and "unreasonable"  payments directly from the trust jeopardized the Plans' tax exempt status based on the U.S. Treasury/Internal Revenue Service (IRS) determination letter which states "Continued qualification of the plan under its present form will depend on its effect in operation. See section 1.401-1(b)(3) of the Income Tax Regulations."

135.

Despite the relatively steady growth of participant counts and asset levels of the Plans and the common providers/platforms/investments, the imprudent funds and share classes remained despite the use of three broker dealers in ten years. These funds were directly taken from trust assets as illustrated by the summary compiled directly from the Defendants' Form 5500 tax filings. (*See* Exhibit 18)

**Exhibit 18**

| Rollins 401k | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EIN: | 22-3723955 ALLIANT RETIREMENT SERVICES | 76-0696203 JAMES E. BASHAW & CO. | 95-2834236 LPL FINANCIAL | 74-2794194 NATIONAL FINANCIAL PARTNERS | 58-1763439 WINDHAM BRANNON | 06-1050034 PRUDENTIAL RETIREMENT INSURANCE AND | 22-1211670 THE PRUDENTIAL INSURANCE COMPANY OF | 23-6994310 PRUDENTIAL TRUST CO. |
| 2018 | $80,752.00 | | | | $36,524.00 | $506,841.00 | | |
| 2017 | $80,752.00 | | | | $36,124.00 | $115,412.00 | | |
| 2016 | $80,752.00 | | | | $46,077.00 | $111,890.00 | | |
| 2015 | $80,752.00 | | | | | $105,570.00 | | |
| 2014 | $80,752.00 | | | | $14,500.00 | $99,770.00 | | |
| 2013 | $20,188.00 | $81,076.00 | | | limited scope | $84,999.00 | | |
| 2012 | | $49,739.00 | $46,992.00 | | | $72,580.00 | | |
| 2011 | | | $110,596.00 | | | $58,025.00 | $326,774.00 | 67699 |
| 2010 | | | $56,693.00 | $17,905.00 | | $62,850.00 | $293,828.00 | 62161 |
| 2009 | | | | $59,162.00 | | $44,325.00 | $185,768.00 | 51883 |
| Rollins 401k Grand Total | $423,948.00 | $130,815.00 | $214,281.00 | $77,067.00 | $133,225.00 | $1,262,062.00 | $806,390.00 | $181,743.00 |
| | | | | | | | | $3,229,531.00 |

| Western Industries 401k | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| EIN: | 22-3723955 ALLIANT RETIREMENT SERVICES | 76-0696203 JAMES E. BASHAW & CO. | 95-2834236 LPL FINANCIAL | 74-2794194 NATIONAL FINANCIAL PARTNERS | 58-1763439 WINDHAM BRANNON | 06-1050034 PRUDENTIAL RETIREMENT INSURANCE AND | 22-1211670 THE PRUDENTIAL INSURANCE COMPANY OF | 23-6994310 PRUDENTIAL TRUST CO. |
| 2018 | $3,313.00 | | | | $7,064.00 | $4,008.00 | | |
| 2017 | $13,252.00 | | | | $11,165.00 | $3,585.00 | | |
| 2016 | $13,252.00 | | | | | $3,385.00 | | |
| 2015 | $13,252.00 | | | | | $3,847.00 | | |
| 2014 | $13,252.00 | | | | | $5,757.00 | | |
| 2013 | $3,313.00 | $20,484.00 | | | | $7,430.00 | | |
| 2012 | | $13,089.00 | $12,697.00 | | | | | |
| 2011 | | | $31,144.00 | | | | $151,663.00 | $31,421.00 |
| 2010 | | | $17,346.00 | $5,994.00 | | $6,825.00 | $148,835.00 | $31,541.00 |
| 2009 | | | | $19,519.00 | | $6,225.00 | $85,159.00 | $26,574.00 |
| Western 401k | $59,634.00 | $33,573.00 | $61,187.00 | $25,113.00 | $18,229.00 | $41,062.00 | $395,657.00 | $89,536.00 |
| Grand Total Both Plans | $483,582.00 | $164,388.00 | $275,468.00 | $102,180.00 | $151,454.00 | $1,303,124.00 | $1,202,047.00 | $271,279.00 |
| Total 2009-2018 all providers | $3,953,522.00 | | | | | | | |
| Total 2014-2018 all providers | $1,571,400.00 | | | | | | | |

**Failure to Secure Bids**

136.

According to the Forms 5500 for 2009 until 2018 filed with the IRS and DOL, the Defendants used Prudential for recordkeeping every year. Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex large plan like the Plan here is to obtain an actual fee quote comparison, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

137.

Because of their size, large defined contribution plans, like the Plans, enjoy economies of scale for recordkeeping and administrative services. As the number of participants in a plan increases, the cost of recordkeeping on a per-participant basis declines. Therefore, the Plans can command far lower fees than a much smaller plan. These lower administrative expenses would have been readily available to the Plans, had Defendants solicited competitive bids.

138.

As discussed above, when a plan includes investments with revenue sharing, plan fiduciaries must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation.

139.

A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

140.

Prudential was and is compensated based on a combination of direct payments from the Plans and revenue sharing payments from the Plans' investment options. Based on many of the fund prospectuses, Prudential may have also received additional indirect compensation, including float, revenue derived from securities lending, distribution fees, etc.

141.

To discharge their fiduciary duties, besides soliciting bids for recordkeeping, Defendants were required to obtain sufficient information to determine all sources of compensation received by Prudential, including the amount of any revenue sharing payments, and to make an informed assessment as to whether the amount of compensation was no more than reasonable for the services provided.

142.

Experts in the recordkeeping industry with vast experience in requests for proposals and information for similar plans have determined the market rate that the Plan likely would have been able to obtain had the fiduciaries put the Plans' recordkeeping services out for competitive bidding.

143.

Based on the direct and indirect compensation levels shown on the Plans' Forms 5500 filed with the Department of Labor, and upon information regarding

the rates of revenue sharing paid out of the investments, the Plans paid

significantly higher fees for services than was reasonable.

144.

 Defendants also failed to control recordkeeping costs as Plan assets grew.

Because revenue sharing payments are asset-based, the already excessive

compensation paid to Prudential became even more excessive as the Plans' assets

grew, even though the administrative services provided to the Plans remained

roughly the same because the number of participants with account balances did not

increase at a similar rate. Defendants could have and should have obtained bids

and pricing based on the number of participants in the Plans, or capped the amount

of revenue sharing at a reasonable fee level to ensure that all amounts above a

reasonable fee for recordkeeping services were returned to the Plans.

145.

Upon information and belief, Defendants failed to conduct a competitive

bidding process for the Plans' recordkeeping services for at least 10 years. This

competitive bidding process would have enabled Defendants to select a

recordkeeper charging reasonable fees, to obtain a reduction in recordkeeping fees,

and to rebate to the Plans any expenses paid by participants for recordkeeping

services that exceeded a reasonable level of fees for the services provided.

146.

Upon information and belief, Prudential remains the Plans' recordkeeper currently, and continues to receive excessive compensation for its services to the Plans.

147.

Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by Prudential, and therefore caused  participants in the Plans to pay unreasonable expenses for administering the Plans.

## VIII.  CLASS ACTION ALLEGATIONS

148.

Fleming brings this action on her own behalf and, pursuant to the provisions of the Federal Rules of Civil Procedure, on behalf of a class of all others similarly situated, defined as follows:

> All current and former employees of Rollins and Western who participated in the Plans on or after January 1, 2008 through the date of judgment, including their beneficiaries but excluding Defendants.

149.

The requirements for maintaining this action as a class action under Rule 23(b)(l) and (b)(2), Federal Rules of Civil Procedure, are satisfied in that:

(a) the Class is large in number; the exact number and identities of all members of the Class are currently unknown to Fleming but are well known to Defendants. The number of members of the Class is believed to be no less than 100.

(b) The members of the Class are so numerous that joinder of all members is impracticable;

(c) There are questions of law common to all members of the Class, including but not limited to whether Defendants violated and continues to violate ERISA by, *inter alia*: (i) failing to prudently select, monitor, and retain Plan fiduciaries, Plan service providers, and Plan investments; (ii) failing to follow the terms of the Plan and ERISA; (iii) engaging or causing the Plan to engage in transactions prohibited by ERISA; and (iv) failing to diversify Plan investments.

(d) Fleming is a member of the Class as defined above; her claim is typical of the claims of the members of the Class and she will fairly and adequately protect the interests of the Class.  Fleming's interests are coincidental with, and not antagonistic to those of the remainder of the Class, and she is represented by experienced ERISA counsel.

(e) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants, and a risk of adjudications

which as a practical matter would be dispositive of the interests of other members

of the Class who were not parties; and

(f) Defendants have acted and/or refused to act and are likely to act and/or

refuse to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive and other equitable relief with respect to the Class as a

whole.

150.

All conditions precedent to bringing this action have been satisfied or

waived.

## IX.    CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty—29 U.S.C. § 1104(a)(1)(B)
### Unreasonable Investment Fees and Performance Losses

151.

Plaintiffs restate and incorporate in Count I the allegations contained in the

preceding paragraphs.

152.

This Count alleges breach of fiduciary duties against all Defendants.

153.

As fiduciaries to the Plans, Defendants were required to manage the assets of

the Plans for the sole and exclusive benefit of Plan participants and beneficiaries,

defray reasonable expenses of administering the Plans, and to act with the care, skill, diligence, and prudence required by ERISA.

154.

To discharge those duties, Defendants were required to independently assess the prudence of each investment option for the Plans on an ongoing basis. *See* Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 590, 595–96 (8th Cir. 2009). Defendants had a continuing duty to review the Plans' investments, and to "remove imprudent ones," as the Supreme Court confirmed. Tibble, 135 S. Ct. at 1828–29.

155.

In making investment decisions for or on behalf of the Plans, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plans, the service providers' financial interest in placing in the Plans in funds that paid out revenue sharing, and whether the higher costs of actively managed funds were justified by a realistic expectation of higher returns. Braden, 588 F.3d at 595–96; Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. §2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

156.

Defendants selected and retained for years Plan investment options with

unreasonable expenses and poor performance relative to other investment options that were readily available to the Plan.

157.

Defendants did not determine whether each of the Plans' investment options was prudent on an ongoing basis. The Plans' investment offerings included funds with expense ratios far in excess of other options available to the Plans, such as institutional share class mutual funds and collective trust funds. In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, knew or should have known that providing numerous actively managed funds with much higher fees compared to index funds, would result in significant underperformance to lower-cost investment alternatives that were readily available and appropriate investment alternatives for the Plans. As a result, the Plans and Plaintiffs collectively suffered millions of dollars in lost retirement savings.

158.

Defendants' failure to engage in a prudent process for monitoring the Plans' investments and removing imprudent ones resulted in the Plans' continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plans.

159.

By abdicating their duty to independently assess the prudence of each option

in the Plans on an ongoing basis, Defendants failed to act prudently and to make investment decisions based solely on the merits of the investments. This was a breach of fiduciary duty.

160.

Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

161.

Each Defendant is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plans all losses to the Plans resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant also is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(3) to make good to Plaintiffs the losses they suffered as a result of Defendants' breach of fiduciary duty.

162.

Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II
### Breach of Fiduciary Duty—29 U.S.C. § 1104(a)(1)(B)
### Unreasonable Administrative Fees

163.

Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

164.

This Count alleges breach of fiduciary duties against all Defendants.

165.

Defendants were required to discharge their duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

166.

If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their fiduciary duty. Similarly, it is a breach of fiduciary duties when fiduciaries fail to calculate and monitor their recordkeeping fees and to continually leverage their plan's size to ensure those costs remain competitive.

167.

Defendants breached their fiduciary duties by failing to engage in a prudent process for selecting and retaining Prudential as the Plans' recordkeeper.

Defendants failed to: monitor the amount of the revenue sharing and other sources of compensation received by Prudential, determine if those amounts were competitive or reasonable for the services provided to the Plans, or use the Plans' size to reduce fees or obtain sufficient rebates to the Plans for the excessive fees paid by participants. Moreover, Defendants failed to solicit bids from competing providers on a flat per-participant fee basis. As the Plans' assets grew, the asset-based revenue sharing payments to Prudential grew accordingly, even though the services provided by Prudential did not increase at a similar rate. This caused the recordkeeping compensation paid to Prudential to exceed a reasonable fee for the services provided, which continues to date. This conduct was a breach of fiduciary duty.

168.

Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

169.

Each Defendant is personally liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plans all losses to the Plans resulting from the breaches of fiduciary duty alleged in this Count and is subject to other equitable or remedial relief as appropriate. Each Defendant also is personally liable under 29

U.S.C. §§ 1132(a)(3) and 1109(a) to make good to the Plaintiffs the losses they

suffered due to the excessive fees as alleged above.

170.

Each Defendant knowingly participated in the breach of the other

Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of

the breach by the other Defendants and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each Defendant is liable for the

losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## <u>COUNT III</u>
### Prohibited Transactions Between the Plan and Party in Interest—29 U.S.C. §1106(a)

171.

Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs.

172.

This Count alleges prohibited transactions against all Defendants.

173.

ERISA prohibits transactions between a plan and a "party in interest," and

provides as follows: "[A] fiduciary with respect to a plan shall not cause the plan to

engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect – …furnishing of goods, services, or facilities

between the plan and a party in interest[.]" 29 U.S.C. §1106(a)(1).

174.

Congress defined "party in interest" to encompass "those entities that a

fiduciary might be inclined to favor at the expense of the plan beneficiaries," such

as employers, other fiduciaries, and service providers. Harris Tr. & Sav. Bank v.

Salomon Smith Barney, Inc., 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–

(C). As a service provider to the Plans, Prudential is a party in interest. 29 U.S.C.

§1002(14)(B).

175.

All Defendants were involved in causing the Plans to use conflicted broker

dealers and investment advisors like LPL, James Bashaw and Alliant that

recommended investments that were detrimental to the Plans and trusts and harmed

participants.

176.

By causing the Plans to use these investment advisors from year to year,

whose services were not necessary and whose fees taken directly from the trusts

were not reasonable, Defendants caused the Plans to engage in transactions that

they knew or should have known constituted the transfer to, or use by or for the

benefit of a party in interest, assets of the plan, in violation of 29 U.S.C. §1106(a)(1)(D).

177.

By causing the Plans to use these investment advisors from year to year, Defendants failed to monitor appointees at least quarterly and caused the Plans to offer inappropriate share classes and investments while also failing to diversify the Plans' investments so as to minimize the risk of large losses, in violation of 29 U.S.C. §1104(a)(1)(C).

178.

Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses suffered by the Plans as a result of these prohibited transactions and to disgorge or provide restitution of all revenues received by Prudential and their subsidiaries from the fees and revenue sharing payments paid by the Plans to these entities, as well as other appropriate equitable or remedial relief.

179.

Each Defendant knowingly participated in these transactions, enabled the other Defendants to engage in these transactions on an ongoing basis, and failed to make any reasonable effort under the circumstances to remedy or discontinue these prohibited transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT IV
### Failure to Monitor Plan Fiduciaries

180.

Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

181.

This Count alleges breach of fiduciary duties against Defendants.

182.

A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

183.

To the extent any of the Defendant's fiduciary responsibilities were delegated to another fiduciary, their monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and in the exclusive interest of participants.

184.

Defendants breached their fiduciary monitoring duties by, among other things: a. failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered

enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plans; b. failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees in violation of ERISA; c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plans' administrative and investment management fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' service providers and the amount of any revenue sharing payments; d. failing to have a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; e. failing to have a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans; f. failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' investments; and g. failing to perform sufficient due diligence in selecting James Bashaw as a Code 27 Investment Advisor to the Plans; h. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent,

excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

185.

As a consequence of these breaches of the fiduciary duty to monitor, the Plans suffered substantial losses. Had Defendants discharged their fiduciary monitoring duties prudently as described above, the Plans would not have suffered these losses. As a direct result of the breaches of fiduciary duty alleged herein, the Plans, and the Plaintiffs and the other Class members, lost millions of dollars of their retirement savings.

## COUNT V
**Breach of Fiduciary Duty of Loyalty—29 U.S.C. §1104(a)(1)(A)**
**Unreasonable Investment Management and Performance Losses**

186.

Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

187.

This Count alleges breach of the fiduciary duty of loyalty against all Defendants.

188.

As fiduciaries to the Plans, Defendants were required to manage the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries,

defray reasonable expenses of administering the Plans, and to act with the care, skill, diligence, and prudence required by ERISA.

189.

As set forth above, Defendants selected and retained for years Plan investment options with unreasonable expenses and poor performance relative to other investment options that were readily available to the Plans. Many of the funds were in higher priced retail share classes when identical lower-cost share classes of the identical funds were readily available to the Plan.

190.

Defendants' selection and retention of Plan investment options with unreasonable expenses and poor performance was the direct and proximate result of Defendants' failure to act for the exclusive purpose of providing benefits to participants and their beneficiaries and to defray expenses of Plan administration, as required by law.

191.

Total Plan losses as a result of Defendants' breach of their duty of loyalty will be determined at trial after complete discovery in this case and are continuing.

192.

Each Defendant is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plans all losses to the Plans resulting from the

breaches of fiduciary duty alleged in this Count and is subject to other+ equitable or remedial relief as appropriate. Each Defendant also is personally liable under 29 U.S.C. §§ 1109(a) and 1132(a)(3) to make good to Plaintiffs the losses they suffered as a result of Defendants' breach of fiduciary duty.

193.

ERISA's fiduciary-duty provisions do not expressly address the appropriate method for calculating losses "resulting from" a breach. 29 U.S.C. 1109(a). The common law of trusts, however, provides guidance. In trust law, an appropriate remedy for a fiduciary breach is restoration of beneficiaries to "the position in which [they] would have been if the trustee had not committed the breach of trust." Second Restatement § 205 cmt. a.

194.

Section 88 Restatement (Third) of Trusts states: "("Investment Costs") "In investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable in relation to the trust assets, the purposes of the trust, and the skills of the trustee." The comment to that section aptly begins: "Wasting beneficiaries' money is imprudent."

195.

Where the breach is due to imprudent investments, the ordinary trust-law remedy is thus the difference between (1) "the value of those investments and their

income and other product at the time of surcharge," and (2) "the amount of funds expended in making the improper investments, increased (or decreased) by a projected amount of total return (or negative total return) that would have accrued to the trust and its beneficiaries if the funds had been properly invested." Third Restatement § 100 cmt. b(1).

196.

Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## X.    <u>PRAYER FOR RELIEF</u>

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that this Court:

   a)  find and declare that Defendants have breached their fiduciary duties as described above;

   b)  find and declare that Defendants committed prohibited transactions and require amendments to 2014 to 2018 Forms 5500 filings to include omitted

87

Schedules G and Forms 5330 to pay required IRS and DOL tier 1 and tier 2 excise taxes related to excessive payments;

c)  find and adjudge that Defendants are personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duty, and to otherwise restore the Plans to the position it would have occupied but for the breaches of fiduciary duty;

d)  determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

e)  order the Defendants to pay to the Plans the amount equaling all sums received by Prudential as a result of recordkeeping, revenue sharing, and investment management fees;

f)  order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plans under §1109(a);

g)  remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

h)  award a surcharge against Defendants and in favor of the Plaintiffs under § 502(a)(3) and the Plans under § 502(a)(2) all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA and caused the damage alleged above;

i)  reform the Plans to include only prudent investments;

j)  reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

k)  require the fiduciaries to select investments and service providers based solely on the merits of those selections, and not to serve the interests of service providers;

l)  certify the Class, appoint the Plaintiff as class representative, and appoint Paul J. Sharman, Esq. of The Sharman Law Firm LLC as Class Counsel;

m) award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

n)  order the payment of interest to the extent it is allowed by law; and

o)  grant such other equitable or remedial relief as the Court deems appropriate.

Respectfully submitted this 20th day of December, 2019.

/s/ Paul J. Sharman
PAUL J. SHARMAN
Georgia State Bar No. 227207

The Sharman Law Firm LLC
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Phone: (678) 242-5297
Fax: (678) 802-2129
Email: paul@sharman-law.com

Counsel for Plaintiffs